UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHANNES WEBER,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF STATE,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)　Civil Action No. 12-00532 (ESH)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

Plaintiff Johannes Weber, proceeding *pro se*, brings this action against defendant United States Department of State ("State Department"), asserting that he has been improperly denied a Certificate of Loss of Nationality (CLN). The State Department has moved to dismiss for failure to state a claim or, in the alternative, for summary judgment.

## BACKGROUND

Weber, who was born on December 24, 1954, in the State of Vermont (Def.'s Mem. in Support of Def.'s Mot. to Dismiss ("Def.'s Mem."), Ex. 1, at 2, June 11, 2012 (Apr. 14, 2009 Memorandum of Vice Consul Shigh L. Sapp ("Sapp Mem.")))), is a dual citizen of Germany and the United States. (Compl. at 1, Apr. 6, 2012.) He "has a criminal history which includes a 1995 conviction on three counts of wire fraud and a 2001 conviction on one count of obstructing justice." *Weber v. United States*, No. 11-cv-0061, 2011 WL 96515, at *1 (D.D.C. Jan. 11, 2011). In 1997, Weber violated the terms of supervised release by fleeing abroad. *See generally United*

*States v. Weber*, 320 F.3d 1047 (9th Cir. 2003). In 2004, while incarcerated, Weber made his first attempt to renounce U.S. nationality.[1]

On April 8, 2009,[2] Weber appeared before Shigh L. Sapp, a vice consul at the United States consulate-general in Amsterdam, the Netherlands. There, Weber swore an oath renouncing his U.S. citizenship, signed several forms, and surrendered his U.S. passport, which had been issued on October 21, 2008. (*See* Compl. at 1; *id.* at 4 (photocopy of Weber's passport); Sapp Mem. at 2.)

In an internal State Department memorandum dated April 14, 2009, Sapp detailed what happened at the consulate. Sapp wrote that although at the interview Weber "appeared to be acting of his own free will, without undue influence from others" and stated that he understood that a renunciation of citizenship was irrevocable, Weber also "displayed other signs that bring into question his mental capacity to formulate the intent required to lose nationality." (Sapp Mem. at 2.) Specifically, Sapp noted that in several phone conversations prior to the interview, Weber had been "very aggressive toward staff," expressing a desire to renounce citizenship immediately and a distaste for bureaucratic "red tape." (*Id.*) At the interview, according to Sapp, Weber "displayed belligerent behaviors, including loud mouthing and verbalizing great

---

[1] While a prisoner at the United States Penitentiary at Lompoc, California, Weber filed suit seeking a writ of mandamus to compel the Secretary of State to issue him a CLN. The Court granted summary judgment "because there is no evidence that plaintiff followed the statutory procedures for renouncing his nationality." *Weber v. U.S. Sec'y of State*, No. 03-cv-01312, slip op. (Dkt. No. 24) at 1 (D.D.C. Jan. 28, 2004). He has also expressed intense antipathy toward the U.S. government. *See, e.g.*, *Weber*, 2011 WL 96515, at *1 (dismissing Weber's $25 million Alien Tort Statute claim against U.S. government "for lost income, false imprisonment, kidnapping, and human rights violations" related to the issuance of an Interpol notice against him).

[2] Weber states in his complaint that these events occurred on or about April 2008 (Compl. at 1), but, as defendant points out, the events at the Amsterdam consulate actually occurred on April 8, 2009. (Def.'s Mem. at 2 n.3; Sapp Mem. at 2.)

resentment toward the U.S. government," claiming that the government "kidnapped him and held him against his will for several years." (*Id.*) Sapp further noted that shortly after the interview, the consulate received an email from Weber, in which he wrote that "his lawyer wanted him to point out that he had been an inpatient under the care of the Veterans Administration's mental health unit in Perryville, Maryland six weeks prior to the interview," that he had "received treatment for post-traumatic stress disorder for the past seven years," and that he had taken medication and seen a physician for treatment. (*Id.*) On the basis of these facts, Sapp recommended that a CLN not be issued. (*Id.*)

Sometime after this interview, perhaps in June 2009, Weber received a certified letter from the State Department, with his passport enclosed, informing him that it would not issue a CLN. (Compl. at 2.) On June 30, 2009, at 6:50 a.m., Weber sent a two-paragraph email to the consulate. In a rambling passage, Weber notes that he received the State Department's letter and states that "I disagree with this finding." (Def.'s Mem. Ex. 2, at 2.) Apparently referring to his earlier convictions, Weber states that "your government kidnapped me from New Zealand" and he was "falsely imprisoned in the United States for 84 months." (*Id.*) Weber added:

> I am making a claim against the United States government for ten million dollars for false imprisonment and other criminal acts against me, and I am making a claim against the property held by the U.S. government in Hamburg Germany the U.S. consulate property, which is no longer a consulate. I will take possesion of that property to compensate me for my damages by your government,s criminal actions against me.

(*Id.*) (errors in original).

On April 6, 2012, Weber – now listing a post office box in Phuket, Thailand, as his address – filed this action, asking this Court to "under the law . . . order the United States Department of State to issue a certificate of loss of United States Nationality." (Compl. at 3.) Weber asserts that his desire to renounce was fully voluntary, that at the time of renunciation he

3

was "not under the influence of any mind-altering drugs or alcohol," and that he "[d]id not suffer from any mental defects and was of sound mind." (*Id.* at 2.) He expresses several times his strong desire not to be a U.S. citizen. (*Id.* at 2–3.) ("This matter is becoming silly . . . . It is pretty clear that plaintiff does not wish to be a United States citizen any longer and never asked for U.S. citizenship in the first place"). Weber claims that he has "sworn an oath of allegiance to the Federal Republic of Germany," has his legal residence in Hamburg, is registered with the German authorities, votes in German national elections, and pays German taxes. (*Id.* at 2.) He also claims that he has not filed and does not pay U.S. income taxes, vote in U.S. elections, or owe military service to the U.S. government, and states that he has "no intention of ever residing in the United States." (*Id.* at 2; *id.* at 5–6 ("Weber Aff.").[3]) Finally, Weber claims that in 2011 he accepted employment with the Iranian National Oil Company. (*Id.* at 5.)

On July 11, 2012, the State Department filed the pending motion to dismiss, or in the alternative for summary judgment. On July 5, 2012, Weber filed an untitled document which this Court construes as a response in opposition to the State Department's motion, and on July 16, 2012, the State Department filed a reply. For the reasons set forth below, the Court will grant defendant's motion.

---

[3] Although titled as an "affidavit," the signed statement dated February 4, 2012, and attached to Weber's complaint is not a proper affidavit because it has not been properly notarized. However, since the writing states that it was "sworn under the penalty of perjury" (Compl. at 5–6), it will be treated as a declaration filed pursuant to 28 U.S.C. § 1746. *See Harris v. Embrey*, 105 F.2d 111, 111 (D.C. Cir. 1939) (per curiam); *Hanan v. United States*, No. 1:05-cv-1062, 2006 WL 1303127, at *2 n.4 (E.D. Va. May 9, 2006); *Phillips v. Martin*, No. 06-cv-2442, 2007 WL 4139646, at *1 (D. Kan. Nov. 16, 2007); *Alexander v. Underhill*, No. 03:05-cv-00178, 2008 WL 510305, at *1 n.2 (D. Nev. Feb. 22, 2008).

## ANALYSIS

I.  **LEGAL FRAMEWORK**

United States law provides that a U.S. national "shall lose his nationality by voluntarily performing" any of a number of expatriating acts "with the intention of relinquishing United States nationality." 8 U.S.C. § 1481(a). When a U.S. national performs an expatriating act, he is "presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily." *Id.* § 1481(b); *see also Lozada Colon v. U.S. Dep't of State*, 2 F. Supp. 2d 43, 45 (D.D.C. 1998) ("expatriation depends not only on the performance of an expatriating act, but also upon a finding that the individual performed such act 'voluntarily' and 'with the intention of relinquishing United States nationality'").

The specific type of enumerated expatriating act here is "making a formal renunciation of nationality before a . . . consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State." 8 U.S.C. § 1481(a)(5).[4] When such a renunciation is taken – or indeed "whenever a . . . consular officer of the United States has reason to believe that a person while in a foreign state has lost his United States nationality" – that officer "shall certify the facts upon which such belief is based to the Department of State, in writing, under

---

[4] Another one of the statutorily-enumerated expatriating acts is "taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof, after having attained the age of eighteen years." 8 U.S.C. § 1481(a)(2). Weber asserts that he has already done this. (*See* Compl. at 6 ("I, Johannes Weber . . . have made an oath of allegiance to the Federal Republic of Germany").)

5

regulations prescribed by the Secretary of State," and "if the report of the . . . consular officer is approved by the Secretary of State," then a CLN shall be issued. 8 U.S.C. § 1501.[5]

The State Department has issued regulations under 8 U.S.C. §§ 1481 and 1501 that (1) prescribe the "form" of formal renunciations of nationality before consular officers and (2) prescribe regulations under which consular officers certify the facts that form the basis for the belief that a person abroad has lost his U.S. nationality.[6] *See* 22 C.F.R. § 50.40(a) (providing that "a person who affirmatively asserts to a consular officer, after he or she has committed a potentially expatriating act, that it was his or her intent to relinquish U.S. citizenship will lose his or her U.S. citizenship")[7]; 22 C.F.R. § 50.50(a) (prescribing details for the content and form of renunciations before consular officials)[8]; 22 C.F.R. § 50.50(b) (providing that when a

---

[5] A CLN does not effect loss of nationality. *United States v. Schiffer*, 798 F. Supp. 1128, 1133 n.6 (E.D. Pa. 1992). Rather, "[i]t is merely an administrative method for the Government to keep track, for informational purposes, of those persons it considers to have voluntarily relinquished citizenship." *Id.*

[6] The Secretary of State formally promulgates these rules, but responsibility for renunciation procedure has been delegated to the Department's Bureau of Consular Affairs, Office of Overseas Citizens Services. (*See* Def.'s Mem. at 3.)

[7] The rule also provides "in other loss of nationality cases" (ones without an "affirmative assertion" of intent to relinquish U.S. citizenship made before a consular officer), "the consular officer will ascertain whether or not there is evidence of intent to relinquish U.S. nationality." 22 C.F.R. § 50.40(a).

[8] "A person desiring to renounce U.S. nationality under section 349(a)(5) of the Immigration and Nationality Act shall appear before a diplomatic or consular officer of the United States in the manner and form prescribed by the Department. The renunciant must include on the form he signs a statement that he absolutely and entirely renounces his U.S. nationality together with all rights and privileges and all duties of allegiance and fidelity thereunto pertaining." 22 C.F.R. § 50.50(a). The "renunciation package," as it is sometimes called (Def.'s Mem. at 3), includes several forms: DS 4080 (Oath/Affirmation of Renunciation of Nationality of United States), *available at* http://www.state.gov/documents/organization/81606.pdf; DS Form 4081 (Statement of Understanding Concerning the Consequences and Ramifications of Relinquishment or Renunciation of U.S. Citizenship), *available at* http://www.state.gov/documents/organization/81607.pdf; DS-4083 (Certificate of Loss of

renunciation is made, the consular officer "shall forward to the Department for approval the oath of renunciation together with a certificate of loss of nationality," and "if the officer's report is approved by the Department, copies of the certificate shall be forwarded" to the renunciant or his representative, and to various U.S. government agencies).

In its *Foreign Affairs Manual* (FAM), the State Department elaborated on these rules for its consular officers, advising that "cases involving persons with established or possible mental incapacity require careful review" to determine if the individual "has the legal capacity to form the specific intent necessary" to renounce under 8 U.S.C. § 1481(b), which provides that to be effective, a renunciation must be voluntary and intentional.  7 FAM 1293(a).  The FAM also states that "[t]he requisite intent may also be found lacking if there is evidence that due to mental incapacity or impairment the individual does not understand the seriousness of renunciation, including its irrevocable nature and the major consequences that flow from it," *id.* 1293(c), and that "[a]n individual who behaves irrationally, belligerently or otherwise unusually may give you reason to question" whether he has the "mental capacity to formulate the intent required." *Id.* 1293(f).  Finally, the FAM notes that while oaths of "renunciation or voluntary relinquishment of troubled citizens who insist on exercising their right to renounce" may be taken, the State Department may "decline to approve the Certificate of Loss of Nationality" if it later "concludes that the facts rebut the presumption of voluntariness," as the power of acceptance lies with the State Department, not the consular officer. *Id.* 1293(h).

## II.    MANDAMUS

Weber asks the Court to order the State Department to issue a CLN, which could be interpreted as a request for mandamus relief.

---

Nationality of the United States), *available at*
http://www.state.gov/documents/organization/81609.pdf.

This Court has "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.  The minimum requirements for a writ of mandamus to issue are: (1) that the plaintiff has a clear and indisputable right to relief, (2) that the defendant has a clear, nondiscretionary duty to act, and (3) that the plaintiff has exhausted all other avenues of relief and has no other adequate remedy available to him.  *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002); *Bond v. U.S. Dep't of Justice*, 828 F. Supp. 2d 60, 75 (D.D.C. 2011).  Even if the plaintiff overcomes these hurdles, whether mandamus relief should issue is discretionary, *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005), and typically there must be some "compelling equitable grounds" for mandamus to issue.  *Nat'l Shooting Sports Found. v. Jones*, 840 F. Supp. 2d 310, 323 (D.D.C. 2012) (citations and quotation marks omitted).  Mandamus is "a drastic remedy, to be invoked only in extraordinary circumstances," and only with "great caution." *Banks v. Office of Senate Sergeant-at-Arms and Doorkeeper of U.S. Senate*, 471 F.3d 1341, 1349–50 (D.C. Cir. 2006) (internal quotation marks and citations omitted).  In particular, "writs of mandamus compelling agency action are 'hardly ever granted.'" *Bond*, 828 F. Supp. 2d at 75 (quoting *Cheney*, 406 F.3d at 729).

While 8 U.S.C. § 1481(a) does "unambiguously" state that a U.S. national "*shall lose* his nationality by voluntarily performing" any of a number of expatriating acts with the intention of relinquishing U.S. nationality, "Congress may establish certain standards for determining whether such a renunciation has occurred." *Vance v. Terrazas*, 444 U.S. 252, 272 (1980) (Stevens, J., concurring in relevant part).  And it has done so: Congress and the State Department, adopting regulations and policies under congressional authorization, have made it clear that CLNs are conditioned on State Department approval.  *See* 8 U.S.C. § 1501, 22 C.F.R. §

50.50(b) (once consular officer makes a report with certification of facts supporting belief that person has lost U.S. nationality, the State Department shall issue a CLN *if*, and only if, such report is approved).[9] "If" is a "conditional term," *Bruesewitz v. Wyeth LLC*, ___ U.S. ___, 131 S. Ct. 1068, 1076 (2011), and its use clearly implies that the State Department has some discretion to determine what constitutes a voluntary relinquishment.

"Congress set forth the circumstances under which a loss of nationality certification would issue," and "[t]he approval, or disapproval, of the issuance of certification is committed by statute to the discretion of the Secretary and thus not subject to this Court's mandamus jurisdiction." *Lozada Colon*, 2 F. Supp. 2d at 45; *accord Clinton v. Clinton*, No. 10-cv-1009, 2010 WL 4828990, at *1–2 (D.D.C. Nov. 29, 2010) (approval of CLN is "an act that is within the discretion of the issuing authority" and so mandamus relief is unavailable). Because "a person is not entitled to a certificate of loss of nationality," Richard D. Steel, *Steel on Immigration Law* § 15:26 (citing *Lozada Colon*), it cannot be said that issuing a CLN is "a ministerial duty . . . so plainly prescribed as to be free from doubt and equivalent to a positive command." *Nat'l Shooting Sports Found.*, 840 F. Supp. 2d at 323 (citations and quotation marks omitted). Thus, Weber is not entitled to mandamus relief.[10]

---

[9] The Court will treat Sapp's memorandum to the State Department recommending that a CLN be "disapproved" as the "report of the . . . consular officer" described in 8 U.S.C. § 1501.

[10] Plaintiff refers, without elaboration, to the preamble to an 1868 act of Congress, declaring that "the right of expatriation is a natural and inherent right of all people," and that any impairment of "the right of expatriation is declared inconsistent with the fundamental principles of the Republic." (Pl.'s Opp'n at 2 (citing Rev. St. § 1999, re-enacting 40 Cong. ch. 249, act of July 27, 1868, 15 Stat. 223).) This freestanding "quasi-constitutional argument," which suggests the State Department must approve a CLN because of the "inherent, natural right to expatriate," was considered and rejected in *Lozada Colon*. 2 F. Supp. 2d at 45.

Moreover, while "[t]he Supreme Court has recognized . . . that a United States citizen has a right to renounce or abandon his birthright of citizenship," the Court has also held that "Congress has broad authority to set the conditions and procedures that an individual must

## III. ADMINISTRATIVE PROCEDURE ACT

Weber's request that the Court order the State Department to issue a CLN could also be interpreted as seeking review under the Administrative Procedure Act (APA). The provisions of the APA relevant to Weber's claim are those that direct the reviewing court to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

APA cases are typically decided via summary judgment. However, instead of determining whether a genuine issue of material fact exists, as is usually the case under Fed. R. Civ. P. 56(c), summary judgment in an APA case is a "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (collecting cases). "Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id*. (citations and internal quotations omitted). In essence, in APA proceedings the district court "sits as an appellate tribunal," reviewing "the entire case . . . as a matter of law." *Amer. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001).

---

satisfy in order to renounce his citizenship." *Duncan v. U.S. Dep't of State*, 2008 WL 4821323, at *1 (W.D. Va. Oct. 30, 2008); *accord Nishikawa*, 356 U.S. at 139 (Black, J., concurring) ("Of course a citizen has the right to abandon or renounce his citizenship and Congress can enact measures to regulate and affirm such abjuration"); *Lozada Colon*, 2 F. Supp. 2d at 45 (Congress has the power to "set forth the circumstances under which a loss of nationality certification would issue," and has given to the Secretary of State by statute the "discretion to determine whether an individual has adequately renounced affiliation with the United States so as to trigger that right").

A claim that the State Department unlawfully withheld a CLN from Weber fails for much the same reason that mandamus is not appropriate: because the State Department has discretion in making decisions about the validity of a renunciation of citizenship. Claims under the "unlawfully withheld" provision of the APA may proceed only where the agency "failed to take . . . agency action that it is *required* to take," and "the limitation to required agency action rules out judicial direction" of "agency action . . . not demanded by law." *Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55, 64–65 (2004). Since issuance of a CLN is not demanded by law, this Court will not compel the Department to grant Weber a CLN under § 706(1).

The second relevant provision of the APA directs the court of "set aside action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is "arbitrary and capricious" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). At core, "to survive arbitrary and capricious review, an agency action must be the product of reasoned decisionmaking," with a "coherent explanation" for the decision. *Fox v. Clinton*, No. 11-cv-5010, ___ F.3d ___, 2012 WL 2094410, at *2, 8 (D.C. Cir. June 12, 2012) (collecting cases). The arbitrary-and-capricious standard of review is "very deferential," *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009); the court will "defer to the wisdom of the agency, provided its decision is reasoned and rational." *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1090 (D.C. Cir. 2009) (citations and quotation marks omitted); *accord Fox*, 2012 WL 2094410, at *8 (citing *Tripoli*

*Rocketry Ass'n, Inc. v. BATF*, 437 F.3d 75, 77 (D.C. Cir. 2006)) (review is "fundamentally deferential," determining only whether process was "logical and rational").

By contrast, the D.C. Circuit has recently held that the State Department's denial of a CLN to an U.S. citizen by birth who had had lived in Israel for over a decade was arbitrary and capricious where the denial was based on "little more than uncited, conclusory assertions of law in a short, informal document" that was "premised on highly questionable assumptions about foreign law" and the result of "possible misunderstandings of the material facts." *See Fox*, 2012 WL 2094410, at *12–13.  But that case is distinguishable.  Here, the State Department's decision not to issue a CLN was the result of sufficiently reasoned decisionmaking.  Weber's erratic behavior, his email informing the consulate that he had been an inpatient at a mental health unit at the Veterans Administration hospital six weeks previously, and his email expressing an intent to sue the U.S. government for $10 million and "take possession" of the U.S. consulate in Hamburg provided more than sufficient support for the State Department to conclude that there was "evidence that due to mental incapacity or impairment," Weber did not have the "requisite intent"  to renounce citizenship.  *See* 7 FAM 1293(c).  Moreover, given the State Department's "discretion to determine whether an individual has adequately renounced affiliation with the United States so as to trigger" the right to expatriate, *Lozada Colon*, 2 F. Supp. 2d at 45, it cannot be said that it abused its discretion by denying a CLN to plaintiff, who had recently been affiliated with the U.S. as a Veterans Administration patient.  In sum, under the APA, there is no reason for the Court to disturb the Department's decision not to issue Weber a CLN.

## CONCLUSION

For the foregoing reasons, the State Department's motion for summary judgment is GRANTED.  A separate order accompanies this Memorandum Opinion.

                                  /s/
                            ELLEN SEGAL HUVELLE
                            United States District Judge

Date:  July 25, 2012